FILED

2005 Jul-27  PM 04:45
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **ROSALYN MOTLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV-7:03-1059-VEH** |
| | ) | |
| **DELPHI AUTOMOTIVE** | ) | |
| **SYSTEMS, LLC, et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF OPINION

This cause is before the court on the *Motion for Summary Judgment* (doc. 139), filed by the defendant Delphi Automotive Systems, LLC (the "defendant" or "Delphi").

### PROCEDURAL HISTORY

The plaintiff, Roselyn Motley, commenced this action on May 7, 2003, by filing an original complaint with this court. In the course of the litigation, the plaintiff amended her complaint twice. In the Second Amended Complaint, which is the most recent one filed, the plaintiff asserts four causes of action. However, on September 1, 2004, the court determined to sever the plaintiff's claims under the

Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.A. § 12101 *et seq.*, from the plaintiff's other claims.  Consequently, only the plaintiff's ADA claims, which are contained in Count I of the Second Amended Complaint, are subject to the instant motion for summary judgment.

The plaintiff asserts four claims under the ADA.  The first is a claim of disparate treatment due to one of the following: plaintiff's actual disability, plaintiff's history of disability, or Delphi's perception that the plaintiff was disabled.  The second claim is for unlawful discrimination due to a disparate impact of Delphi's facially-neutral policy.  The third claim is for conducting a pre-employment medical exam in violation of the ADA.  The plaintiff's fourth claim is for breach of confidentiality in violation of 29 C.F.R. §§ 1630.13, 1630.14.

In the instant motion, Delphi moves for summary judgment on all of the plaintiff's ADA claims against it.  The motion is fully briefed, and both sides have filed evidence in support of their respective positions.  The court conducted a hearing on the motion on June 3, 2005.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transp.*, 229 F.3d 1012, 1023

(11th Cir. 2000).   The party asking for summary judgment always bears the initial

responsibility of informing the court of the basis for its motion and identifying those

portions of the pleadings or filings which it believes demonstrate the absence of a

genuine issue of material fact.   *Celotex Corp.*, 477 U.S. at 323.   Once the moving

party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the

pleadings and by his own affidavits, or by the depositions, answers to interrogatories,

and admissions on file, designate specific facts showing that there is a genuine issue

for trial.   *Id.* at 324.

All reasonable doubts about the facts and all justifiable inferences are resolved

in favor of the non-movant.   *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of

Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).   A dispute is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Chapman*, 229 F.3d at

1023.   If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted.   *Anderson*, 477 U.S. at 249.

## FACTS

For twenty-two years, the plaintiff Motley worked as an assembler for the defendant Delphi.  In approximately 1990, Motley began suffering from depression.  Doctors at the time noted that her depression also involved elements of paranoia, obsessiveness, and hallucinations, and diagnosed it as having characteristics of Schizoaffective Disorder or Schizophrenia.   At various times, Motley experienced suicidal and homicidal thoughts.  Throughout the 1990s, Motley's psychiatrists often identified a link between the stress Motley was under at her job and the severity of her depressive symptoms.  Motley was placed on several medical leaves during this period and experienced several periods of hospitalization.  Each time, Motley's symptoms would abate, only to return when Motley attempted to return to work.  Motley's medical history also indicates that Motley had a poor awareness, what doctors refer to as a lack of insight, of the significance of her symptoms.  She often would down-play or understate the significance of her past illness and symptoms to doctors, who later would review her file and discover the true severity of her illness.  Motley also has a history of quitting her medication without her physician's authorization.

Problems that Motley experienced at work eventually led to her transferring from Detroit, Michigan, to Tuscaloosa, Alabama.  However, the change of location

did not improve Motley's condition.  In 1997, Motley sought a transfer to a Delphi plant in New York, but ultimately decided against it.

In 1995, the Social Security Administration determined that Motley was entitled to disability benefits under the Social Security Act.  She has been receiving approximately $1,300 a month in Social Security disability benefits since then.

Delphi operates under a collective bargaining agreement ("CBA") with the United Auto Workers (UAW").  ("Supplemental Agreement Covering Pension Plan between Delphi and the UAW" (hereinafter "Delphi-UAW CBA"), Gilliam Decl., ex. 1.)  Under the agreement, employees can receive a pension if they are determined to be completely disabled.  The program is called the Total and Permanent Disability Pension or T&PD.   In 1999, Motley was determined to be disabled under this provision of the CBA, and she began to receive a pension of $822.75 a month.

However, in 2001, Motley sought to return to work at Delphi.  Motley's prior psychiatrist, a Dr. Kafi, had passed away, and his practice was taken up by Dr. Madhu Mendiratta.  In February 21, 2001, Motley received a return to work clearance from Dr. Mendiratta, which she submitted to Delphi.

The Delphi-UAW CBA contains an elaborate process for determining a T&PD retiree's entitlement to return to service.  First, the retiree must provide medical evidence of the retiree's recovery from disability that is "satisfactory to the

Corporation."[1]   If Delphi is satisfied by the retiree's showing, then the retiree is

reinstated.  If Delphi is not satisfied, the Plant Medical Director contacts the UAW's

Benefit Representative, who must determine whether to challenge the decision not to

reinstate the retiree.[2]   If the Benefit Representative disagrees, he contacts the UAW's

International Representative in the UAW-GM Department, who also reviews the

matter.[3]   If UAW's International Representative disagrees with the decision, he

forwards the matter to Delphi's Employment Benefits Staff.  Delphi's Benefits Staff

and Delphi's Corporate Medical Director then review the matter and provide an

explanation to the UAW of why the retiree has not recovered and is not able to

---

[1]Appendix D, § B(3)(h)(i)(1) of the CBA provides:

> The retiree will provide medical evidence to the Plant Medical
> Director, satisfactory to the Corporation, that supports that such
> retiree is no longer T&PD.  The information will include, among
> other relevant information, a narrative report that details what has
> improved and why the condition under which the retiree was
> determined to be T&PD no longer exists or no longer disables the
> retiree.  Documentation will include appropriate lab reports and/or
> test results.

[2]Appendix D, § B(3)(h)(i)(3) of the CBA provides:

> If the Plant Medical Director determines that the retiree has not
> recovered and should remain on T&PD retirement, the retiree will
> continue in T&PD status under the Pension Plan.  The Plant
> Medical Director will advise the retiree, and UBR and the Center.

[3]Section B(3)(h)(i)(5) of the CBA provides that "[i]f the retiree disagrees, the retiree may
contact UBR.  If the UBR disagrees with the Plant Medical Director's determination, the UBR
will forward the case, with all pertinent medical information, to the International Representative
in the UAW-GM Department."

engage in regular employment in the plant.[4]  If the International Representative continues to disagree, he can request that an impartial specialist physician examine the retiree to make a determination on whether the retiree remains totally and permanently disabled.[5]  The decision of the impartial specialist physician is "final and binding on the retiree, the Union and the Corporation." (Delphi-UAW CBA, Gilliam Decl., ex. 1 at 96.)

On July 11, 2001, Dr. Mendiratta provided a one and a half page letter indicating Motley was not experiencing symptoms and was capable of returning to work with no restrictions.   Delphi's Divisional Medical Director, Dr. Michael Jackson, received the letter and determined that this statement was insufficient.  Dr. Jackson's subsequent attempts to obtain a more detailed statement from Dr.

_____

[4]Appendix D, § B(3)(h)(i)(5) of the CBA provides that "[t]he International Representative may forward the case to the Delphi Employee Benefits (EB) Staff.  After reviewing the case with the Corporate Medical Director, the Delphi EB Staff will provide the International Representative with the Corporate Medical Director's decision of why the retiree has not recovered and is not able to engage in regular employment on a job within the plant."

[5]Appendix D, § B(3)(h)(i)(5) of the CBA provides

> If the International Representative disagrees with the determination of the Corporation, the International Representative and the Delphi EB Staff may agree to schedule an exam with an impartial specialist physician … . [I]n all cases where the retiree has been retired for five or more years, the retiree has been sent to an impartial specialist approved by the Delphi EB Staff and the International Representative.  The impartial specialist physician will determine whether the retiree has recovered and is able to engage in regular employment on a job within the plant.

Mendiratta were unsuccessful.  Following consultations with Jim Petrie, the manager

of Delphi's benefits staff, and Dr. Salvatore Galante, Delphi's Corporate Medical

Director, Dr. Jackson denied Motley's petition finding that the information Motley

provided was insufficient to determine that Motley could safely return to work.  At

this point, the UAW intervened and requested that Delphi permit Motley to submit

to an independent medical exam.  The UAW proposed Dr. Craig Lemmen, a neutral

and board-certified forensic psychiatrist, and Delphi agreed.

On March 22, 2002, Dr. Lemmen examined Motley for an hour and a half.

After the interview, he reviewed her file.  Dr. Lemmen determined that, although

Motley's mental condition appeared good during the interview, he was troubled by

her tendency to understate the severity of her past condition.[6]  He noted several

instances where Motley omitted information about her history and further noted her

historic practice of understating her symptoms to her doctors when she wanted to

influence them to return her to work.  Dr. Lemmen also noted that Motley exhibited

a pattern in the past of returning to work, only to experience a spike in the severity

of symptoms.  Finding nothing to indicate that this pattern had been broken, Dr.

---

[6]Dr. Lemmen wrote that "[c]urrently, [Motley] reports that she is asymptomatic, but it is
noted that she very clearly was trying to put herself in a positive light.  Of concern, additionally,
are the gross discrepancies between the history that she reported to me and the history that is well
documented in her records."  (Lemmen Dep., ex 1 at 4.)

8

Lemmen declined to clear Motley to return to work:

> The record suggests that she has a severe disorder which has been fairly chronic and required both antidepressant and antipsychotic medication.… [T]he chances of her relapsing when placed in a stressful situation are relatively high. The circumstance at this time is very similar to previous times when her treating physicians felt she could return to work, but a second opinion was doubtful that she would be successful. At this point in time, I am, similarly, very doubtful that she would be successful in a return to work given the chronicity and magnitude of her illness, and I could not support a return to work at this time or any time in the reasonable future.

(Lemmen Dep., ex. 1 at 4.) Dr. Lemmen's determination was final and binding on Delphi and the UAW, and both parties accepted the decision.

Shortly thereafter, Motley filed a charge with the EEOC. Motley's EEOC charge complained that Delphi regarded her as disabled and on that basis refused to reinstate her.

## ANALYSIS

### I.      *Scope of the EEOC Complaint*

The first argument between the parties relates to the scope of the EEOC charge. Delphi argues that the EEOC charge only embraces Motley's claim that she was discriminated against because she was "regarded as" disabled. Delphi argues that this charge does not include Motley's current claims of (1) actual disability; (2) failure to

accommodate; (3) discrimination due to a "record of" disability; (4) disparate impact; (5) improper pre-hire medical inquiry; and (6) breach of confidentiality. Because the EEOC complaint did not encompass these claims, Delphi argues that they are time-barred. Plaintiff responds that these claims are properly before the court because they "reasonably relate" to, and are not "materially different from," the claims of discrimination in Motley's charge.

The Eleventh Circuit has "long required plaintiffs to exhaust their administrative remedies before bringing suit under Title VII." *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989). However, the Eleventh Circuit does not require strict compliance with the exhaustion requirement "where the plaintiff has filed a charge with the EEOC, but in her judicial action the plaintiff raises related issues as to which no filing has been made." *Id.* "As long as allegations in the judicial complaint and proof are 'reasonably related' to charges in the administrative filing and 'no material differences' between them exist, the court will entertain them." *Id.* In establishing the boundaries between what is "reasonably related," the Eleventh Circuit instructs that "[j]udicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate." *Id.* (quoting *Ray v. Freeman*, 626 F.2d 439, 443 (5th Cir.1980)).

Delphi is correct that Motley's EEOC charge only contains a claim for discrimination due to being regarded as disabled.[7]  Accordingly, Motley can assert additional ADA claims before this court only if her additional claims "reasonably relate" to Motley's "regarded as" claim.

Applying the principles outlined above to Motley's charge, it is clear that the plaintiff's improper pre-hire medical inquiry claim and the breach of confidentiality claim are not "reasonably related" to the plaintiff's claim that she suffered discrimination because Delphi regarded her as disabled.  These claims arise from factual transactions that are separate and distinct from those related to Delphi's failure to reinstate Motley.  A basis for these claims are nowhere contained in the EEOC charge.  The claims, therefore, constitute the sort of "[a]llegations of new acts of discrimination" that are subject to an independent duty to exhaust.  *Wu*, 863 F.2d at

---

[7]Motley's EEOC charge gave the following particulars:

> I worked for Delphi Automotive Systems … as an assembler.  In 1999, I left work for Delphi due to a disability.
> In 2001, my doctor released me to return to work.  I reapplied with Delphi for a position on or about August 8, 2002.  I was told I could not be rehired because of my disability.  Delphi regarded me as disabled.  There is no medical reason that I cannot return to work.  I am qualified and able to work.  I am willing to submit to a third party doctor to examine my ability to work.  I want to return to work.
> I believe I have been discriminated against in violation of the American with Disabilities Act because of a perceived disability.

(Motley Dep., ex. 1.)

1547.

Regarding the plaintiff's disparate impact claim, the touchstone for determining whether a claim is reasonably related to the claim stated in the plaintiff's EEOC charge is whether "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* This consideration controls because the purpose of the EEOC exhaustion requirement is the promotion of informal settlements between the parties. *Id.*

Delphi points out that another district court within this circuit has ruled that a disparate impact claim is not reasonably related to a disparate treatment claim. *See Murray v. Archbold Memorial Hospital*, 50 F. Supp. 2d 1368 (M.D. Ga. 1999). The court finds the opinion in *Murray* persuasive because the focus of a disparate impact claim is quite distinct from the focus of a disparate treatment claim. Whereas a disparate treatment claim focuses on the intent of the employer and its agents in their dealings with an individual plaintiff, a claim of disparate impact focuses on statistical information regarding the effect of a facially-neutral policy towards numerous employees and it also must focus on the policy's business relatedness and whether less discriminatory alternatives exist. These questions simply are not germane to a disparate treatment claim. *See, e.g., Raytheon Co. v. Hernandez*, 540 U.S. 44, 53

(2003) (explaining that "[b]ecause the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes, courts must be careful to distinguish between these theories").  For that reason, it would not be reasonable to expect the EEOC's investigation of a disparate impact claim to grow out of the plaintiff's claim that she experienced disparate treatment because she was regarded as disabled.

Conversely, however, the EEOC's investigation of the plaintiff's disparate treatment claim for being "regarded as" disabled reasonably could grow into an investigation of the plaintiff's claims that she was discriminated against because she was actually disabled, had a record of disability, and due to Delphi's failure to accommodate her disability.  These claims arise from the same factual transaction and relate to the same alleged adverse employment actions taken against the plaintiff. Furthermore, all of these claims focus on the employer's state of mind when it made decisions regarding the plaintiff's reinstatement as an assembler.

Accordingly, the defendant is entitled to summary judgment on the following claims on the ground that the plaintiff failed to include these claim in a timely-filed charge with the EEOC: 1)  plaintiff's claim that Delphi's facially-neutral policy had a discriminatory disparate impact on the disabled (Count I, ¶¶ 22, 24); 2) plaintiff's

claim that Delphi violated the confidentiality provisions of the ADA (Count I, ¶ 25); and 3) plaintiff's claim that Delphi engaged in a prohibited pre-hire medical examination (Count I, ¶ 25).[8]

## II.   *Collateral Estoppel*

Delphi argues that Motley is estopped from arguing that she is capable of working because since 1995 she has collected, and continues to collect, social security benefits. Under *Cleveland v. Policy Management Systems*, 526 U.S. 795 (1999), the mere fact that a plaintiff receives social security benefits does not, without more, preclude the plaintiff from arguing that he or she is a qualified individual under the ADA. However, Delphi argues that, even under *Cleveland*, a plaintiff must explain why his or her collection of social security benefits is not inconsistent with his or her claim that he or she is qualified. *See Cleveland,* 526 U.S. at 806 ("[W]e hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises

---

[8]Alternatively, the defendant also is entitled to summary judgment on these claims on their merits. Motley cannot show any disparate impact because she fails to show that a protected class of people were more negatively impacted than another class of people. *See Cooper v. Southern Co.*, 390 F.3d 695, 716 (11th Cir. 2004) ("To prove disparate impact, a plaintiff must establish the existence of a statistically significant disparity among members of different groups affected by a type of employment decision[.]"). Plaintiff's confidentiality claim fails because Motley signed a waiver permitting Dr. Lemmen to release her medical records to the UAW. (Motley Dep., ex. 10.) Plaintiff's claim that Delphi conducted an unlawful pre-employment medical exam fails because it is undisputed that the medical exam that Delphi conducted was not a pre-employment medical inquiry, but instead was a fitness for duty medical exam following a long period of medical leave. *See* 29 C.F.R. §§ 1630.13.

out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation.").

In her defense, plaintiff states that she has reported to the social security administration all income received since she started collecting benefits.  Although Motley agrees that it would be inconsistent to continue collecting Social Security Benefits if Delphi reinstated her, she argues that this is not a problem because Delphi refused reinstatement.  Because Delphi takes the position that Motley is permanently disabled and therefore refused to employ her, Motley argues that there is no inconsistency in her continuing to collect Social Security until such time as Delphi alters its position or Motley takes another full-time position.

The court accepts Motley's explanation.  If the court were to require that, prior contesting Delphi's position that she is permanently disabled, Motley first had to disclaim social security, the court merely would be compelling Motley to run the risk of a doubly adverse outcome—i.e., of having to forego her right to disability benefits only to receive an adjudication that her receipt of the benefits was proper.  The integrity of the judicial system is not advanced by requiring Motley to subject herself to a maximum risk of adverse judgment.

As the Supreme Court in *Cleveland* recognized:

> [there is a level of] inconsistency in the theory of the

claims [that] is of the sort normally tolerated by our legal system. Our ordinary Rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to set forth two or more statements of a claim or defense alternately or hypothetically,' and to 'state as many separate claims or defenses as the party has regardless of consistency.' Fed. Rule Civ. Proc. 8(e)(2). We do not see why the law in respect to the assertion of SSDI and ADA claims should differ.

*Cleveland*, 526 U.S. at 805.

Motley has adequately explained how her argument that she is a qualified individual is not inconsistent with her continued receipt of Social Security benefits. According, Delphi is not entitled to summary judgment on collateral estoppel grounds.

### III. *Waiver*

Delphi argues that Motley is bound by the determination of the T&PD impartial specialist. Delphi notes that the process is comprehensive, fair, and impartial and that the CBA specifies that "[t]he decision of the impartial clinic or physician is final and binding *on the retiree*, the Union and the Corporation." (Delphi-UAW CBA, Gilliam Decl., ex. 1 at 96) (emphasis added). Additionally, Delphi argues that equitable considerations favor finding that Motley waived her right to challenge the T&PD procedure. Having accepted the benefits of T&PD retirement, which included an

$822.75 a month stipend for a period of four years, fairness ordinarily would dictate that Motley also accept the restrictions that the program imposes on reinstatement.

The difficulty with this position, however, is that the law is clear that a waiver of federal rights, including a right to a judicial forum to resolve federal claims, must be "clear and unmistakable." *See Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 80 (1998); *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693 (1983). Because the T&PD provisions to not contain an express waiver of an employee's right to a judical forum to resolve any ADA claims, the contract's dispute resolution procedure cannot be construed as an effective waiver of Motley's right to bring this action.

## IV.      *Whether Motley Is Disabled*

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to … the … discharge of employees, employee compensation, … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail under the ADA, the plaintiff must prove a *prima facie* case of disability discrimination by showing: (1) she has a disability, as that term is defined under the ADA; (2) she is qualified to serve in the disputed position with or without some reasonable accommodation, despite her disability; and (3) she has suffered an adverse employment action because of his disability. *Doe v. DeKalb County Sch. Dist.*, 145

F.3d 1441, 1445 (11th Cir. 1998); *Smith v. Ala. Dep't of Corr.*, 145 F. Supp. 2d 1291, 1300-01 (M.D. Ala. 2001); *Gable v. USS*, No. CV96-S-666-S, 1997 U.S. Dist. Lexis 23897, at *9-10 (N.D. Ala. Apr. 28, 1997).

The ADA contains three definitions of disability.  Section 3(2)(A) defines an individual as disabled where the individual possesses "a physical or mental impairment that substantially limits one or more of the major life activities of an individual."  42 U.S.C.A. § 12102(2)(A).  Section 3, subparagraphs (2)(B) and 3(2)(C) of the ADA define an individual as disabled based on the fact that the individual has "a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C.A. § 12102(2)(B)-(C).

Here, Motley brings claims under all three definitions.  Motley's primary argument is under section 3(2)(B) and (C), whereby she claims that she is *not* actually disabled.  Rather, Motley argues that she is essentially capable of doing the job of an assembler and that Delphi failed to reinstate her due to its prejudice against mental illness and due to the defects in Delphi's T&PD process which violates the ADA by improperly placing the burden of proof on the permanently disabled employee to show that there is no reasonable chance of relapse.  If, however, the court rejects her primary argument, Motley's fallback position is that she *is* actually disabled, but that she nevertheless is capable of doing the job despite her disability.

18

The distinction between the different definitions of disability often is important because a plaintiff who claims that he or she is not actually disabled may not be entitled to seek a reasonable accommodation.[9]  Here, however, there is no difference because, even if the court finds that Motley is actually disabled, the plaintiff concedes that Motley does not seek any accommodation.[10]

In her Second Amended Complaint, Motley alleges the major life activities of concentrating, interacting with others, sleeping, and working.  (Second Amended Compl., doc. 106, ¶10.)  In her brief opposing summary judgment, Motley also mentions the major life activity of thinking.  (Memorandum Opp. Summ J. at 16.)  Motley can prove that she was regarded as being disabled by showing that the defendant mistakenly believed either that she had a physical impairment that substantially limited one or more major life activities or that defendant believed that an actual, nonlimiting impairment substantially limited one or more major life

---

[9]The following circuits have held that plaintiffs who are perceived to be disabled but are not actually disabled may not seek a reasonable accommodation. *See Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1231-33 (9th Cir. 2003); *Weber v. Strippit, Inc.*, 186 F.3d 907, 916-17 (8th Cir.1999); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir.1999); *Newberry v. E. Texas State Univ.*, 161 F.3d 276, 280 (5th Cir.1998); while the following circuits have held that such plaintiffs may do so.  *See Kelly v. Metallics West, Inc.*, 410 F.3d 670, 675 (10th Cir. 2005); *Williams v. Philadelphia Housing Auth. Police Dep't*, 380 F.3d 751, 773-76 (3d Cir. 2004); *Katz v. City Metal Co., Inc.*, 87 F.3d 26, 33 (1st Cir.1996).

[10]At oral argument before the court, the plaintiff expressly conceded its claim for failure to provide a reasonable accommodation.  Accordingly, summary judgment on that claim (Count I, ¶ 23)  is due to be **GRANTED**.

activities.  *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).  In either

scenario, "it is necessary that [the defendants] entertain[ed] misperceptions about the

individual …. These misperceptions often 'result from stereotypic assumptions not

truly indicative of . . . individual ability.'"  *Sutton*, 527 U.S. at 489 (quoting 42 U.S.C.

§ 12101(7)).

The parties agree that Motley suffers from a mental impairment.  Delphi argues

that Motley cannot show a prima facie case that Delphi regarded her as disabled or

knew of her record of disability.  However, Motley has adduced evidence sufficient

to create a dispute of fact as to whether Delphi regarded her as disabled.  Although

Delphi's Divisional Medical Director, Dr. Jackson, maintained a general ignorance

as to Motley's disability, Dr. Mendiratta's letter to him of July 11, 2001, plainly

apprizes him of Motley's history of disability, and of her limitations in the activities

of concentrating, sleeping, interacting with others, caring for herself, and thinking.

(Mendiratta Dep., ex. 8.)  Dr. Jackson was equally aware that Motley was T&PD

disabled.  Dr. Jackson testified to his understanding that T&PD disability meant that

Motley "is totally and permanently disabled from gainful employment."  (Jackson

Dep. at 72.)

With respect to actual disability, Motley must show that she is "prevent[ed] or

severely restrict[ed]" from performing the activities.  *Toyota Motor Mfg., Ky., Inc. v.*

*Williams*, 534 U.S. 184, 185 (2002).  Furthermore, the impairment's impact must be permanent or long term. *Id.* In determining whether an impairment substantially limits the plaintiff, the court must consider any mitigating measures that correct or lessen the effects of the impairment.  *See Sutton*, 527 U.S. at 482-83.

The only major life activity with respect to which  Motley argues that she is *actually disabled* is the major life activity of working. Consequently, although EEOC guidelines recommend that courts should consider all other major life activities prior to examining a claim that an individual is substantially limited in the major life activity of working, *see* 29 C.F.R. Pt. 1630 app. at 365, the court has no option but to address the argument.

 To demonstrate that she is substantially limited in the major life activity of working, the plaintiff must show "significant[ ] restrict[ions] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 912 (11th Cir. 1996) (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  Delphi argues that Motley cannot show that her impairment substantially limits her in the activity of working.  However, there is ample evidence creating genuine issues of fact as to whether Motley is substantially limited in the major life activity of working.

21

To begin, there is the Social Security Administration's determination that she is completely disabled.  The Social Security Administration's finding constitutes its judgment that Motley is unable "to engage in any substantial gainful activity by reason of any ... physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(A).

Second, there is Delphi's determination that Motley is entitled to T&PD disability.  This finding constitutes Delphi's conclusion that Motley is "wholly and permanently prevented from engaging in regular employment or occupation with the Corporation at the plant or plants where the employee has seniority for remuneration or profit as a result of bodily injury or disease …."  (Delphi-UAW CBA, Gilliam Decl., ex. 1 at 5.)  Taking these findings together, they create a genuine issue of fact as to whether the plaintiff was significantly restricted in her ability to perform a broad range of jobs in various classes as compared to the average person.

Delphi notes that, since the Social Security Administration found Motley incapable of working, Motley has held other jobs.  Based upon this fact, Delphi argues that Motley has not shown that she is substantially limited in working.  However, Motley does not need to provide evidence that she is incapable of working to qualify as disabled; rather, she only must adduce evidence that she is substantially

limited.  *See* 29 C.F.R. Pt. 1630 app. at 366.   The Social Security Administration's finding, as bolstered by Delphi's decision to place Motley on permanent disability retirement, permit the inference that Motley is sufficiently limited in the activity of working.

### V.   *Whether Motley Was a Qualified Individual*

The ADA requires that a plaintiff demonstrate that she is otherwise qualified for a position in order to bring a claim.  A "qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12112(a).

Plaintiff argues that Motley has 22 years of experience as an assembler and therefore clearly possesses sufficient education and skills to perform the job.  Motley further argues that, based upon the medical opinions she submitted from Drs. Mendiratta and Goff, she had recovered from her mental disability and therefore was mentally fit for the position.

Delphi responds that the T&PD impartial specialist physician expressly found that Motley was not qualified for reinstatement.  Dr. Lemmen concluded that the chances of Motley relapsing "when placed in a stressful situation are relatively high." (Lemmen Dep., ex. 1.)  Due to Motley's inability to handle stress, he concluded that she was not capable of performing the job without causing injury to her mental health.

23

The Eleventh Circuit has ruled that "[a]n employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position. Absence of such skills prevents the employee from being 'otherwise qualified.'" *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290-91 (11th Cir. 2002). In *Williams*, the Eleventh Circuit applied the standard that "a mere scintilla of evidence does not create a jury question.… Rather, there must be a substantial conflict in evidence to support a jury question." *Id.* at 1290 (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)). Based upon this standard, the Eleventh Circuit affirmed an award of judgment as a matter of law based upon "overwhelming evidence" that the plaintiff was not qualified due to her inability to handle stress. *Id.*

Motley relies on the opinions of Drs. Mendiratta and Goff to rebut Dr. Lemmen's determination. In her letter to Dr. Jackson of July 11, 2001, Dr. Mendiratta expressed the opinion that Motley could handle work stress.[11] Dr. Goff offered his determination that, in March of 2004 and possibly in October of 2002,

---

[11]Dr. Mendiratta wrote that "Ms. Motley is able to deal with daily stressors and said that she appears 'to be more human now.' She is fully intact and is able to deal with her daily stressful situations." (Jackson Dep., ex. 5, bate no. 01487.) Delphi attacks Dr. Mendiratta's opinion on the basis that (i) she issued Motley a return to work authorization after meeting with Motley for only twenty minutes, and (ii) Dr. Mendiratta admitted in her deposition testimony that she would not have cleared Motley to work had she been aware of Motley's medical history. (Mendiratta Dep. at 207.)

Motley no longer suffered from mental illness.[12]  Although the competence of this

evidence is not beyond doubt—and portions of the opinions of Drs. Goff and

Mendiratta are the subject of motions to strike—the court will assume, without

deciding, that the evidence is sufficient to create a genuine dispute of fact as to

whether Motley was qualified for the position of an assembler when Delphi denied

her reinstatement, and proceed to the next step in the analysis.

## VI.   *Legitimate Non-Discriminatory Reason*

In determining whether a plaintiff suffered an adverse employment action

---

[12]Dr. Goff's determination was based upon his application, in October 2002, of the Minnesota Multiphasic Personality Inventory, along with an examination of Motley that he conducted, in preparation for this litigation, on March 30, 2004.  In May, 2004, Dr. Goff opined:

> [T]his lady is not demonstrating any symptoms whatsoever according to my mental status examination or according to psychometric investigation.  Her current mental status is not compatible with the presence of psychosis.  Hence, I cannot find any particular reason to suggest that she is unable to function in her previous capacity. … As of August 2002 and as of 30 March 2004 … I could not find any definitive symptoms suggestive of significant mental illness despite the fact that the patient was not taking any significant psychotropic medications, particularly in March 2004.  My review suggests that it was the opinion of her treating physicians at the time that she was capable of returning to work.  I am in agreement with those opinions.

(Goff Dep., ex. 4 "Addendum" at 2.)  On March 30, 2004, Dr. Goff offered the following view:  "I think to a certain extent Dr. Lemmen's assumptions in regard to her condition are based more on history than her actual presentation because it does not appear that he perceived any specific problems either."  (*Id.*, ex. 4 at 6.)  Delphi attacks Dr. Goff's competence, as a psychologist rather than a psychiatrist, to challenge the conclusions of Dr. Lemmen, and further challenge Dr. Goff's conclusions on the ground that they were made from six months to two years after Dr. Lemmen performed his evaluation.

because of disability, claims under the ADA are evaluated under the proof models developed for Title VII. *See Hilburn v. Murata Elecs. N. Am. Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). Under this framework, after the plaintiff makes a *prima facie* case of discrimination, the defendant must articulate a legitimate, non-discriminatory reason for the challenged employment action. *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1141-42 (11th Cir. 1983). The plaintiff then must adduce evidence demonstrating that the defendant's legitimate, non-discriminatory reason is pretextual.[13] *Id.*

Delphi argues that it is entitled to summary judgment on Motley's ADA claim because it has made an unrebutted showing that Motley was not reinstated based upon a legitimate, non-discriminatory reason. Dephi has presented evidence that its decision not to reinstate Motley was based upon the legitimate, non-discriminatory ground that Delphi was obligated to comply with the T&PD retirement procedures

---

[13]Motley argues that the proof model for a circumstantial case of discrimination is inapplicable here because Motley has adduced direct evidence of discrimination. As direct evidence, Motley cites Dr. Lemmen's conclusion that her mental illness rendered her unqualified for reinstatement due to her inability to handle work-related stress. If Motley's position were accepted, courts would be compelled to find evidence of discrimination any time an employer relied on a medical expert's opinion that an employee's impairment rendered them unqualified for a position. It would be antithetical to the ADA to create this kind of a deterrent for employers to make decisions about employees with physical or mental impairments on the basis of sound medical judgment rather than a layman's judgment. In any event, the short answer to Motley's argument is that Dr. Lemmen's opinion is not evidence that Dr. Lemmen was discriminating against Motley due to her substantial limitation in the major life activity of working. Rather, it is evidence of Dr. Lemmen's medical opinion that subjecting Motley to the work environment at Delphi would be harmful to her mental health.

contained in Delphi's collective bargaining agreement with the UAW.  The court agrees.  Delphi's obligation to comply with the CBA constitutes a legitimate, non-discriminatory reason on two grounds.

First, the United States Supreme Court has ruled that a company's "neutral, generally applicable … policy" is a "quintessential legitimate, nondiscriminatory reason for refusing to rehire an employee who was terminated for violating workplace conduct rules." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 54-55, (2003).  The CBA's T&PD retirement policy is generally applicable, and, because the process is resolved by means of a impartial medical expert, is "neutral."

Second, complying with the CBA is legitimate and non-discriminatory because it is legally mandated as a matter of federal contract and federal labor law.  *See* Labor-Management Relations Act ("LMRA"), § 301(a), as amended, 29 U.S.C.A. § 185(a) (establishing federal jurisdiction over actions for breach of a collective bargaining agreement);[14] National Labor Relations Act ("NLRA"), § 8(d), as amended, 29 U.S.C.A. § 158(d) (prohibiting a party from modifying a collective bargaining agreement mid-term without, *inter alia*, providing notice and offering to meet and

---

[14]*Textile Workers Union of Am. v. Lincoln Mills*, 355 U.S. 448, 456 (1957) (holding that collective bargaining agreements are governed by federal common law).

confer with the other party to the contract).[15]

Motley resists this conclusion by arguing that the IME is not a legitimate, non-discriminatory reason to deny reinstatement because (1) Delphi may have had flexibility to deviate from the CBA; and (2) the IME did not comport with the requirements of the ADA because Dr. Lemmen relied on Motley's medical history and not Motley's contemporaneous condition.

As a matter of law, Motley's argument that Delphi had flexibility to deviate from the CBA is spurious.  In support of this argument, Motley notes that while the T&PD procedures call for the *Plant* Medical Director to receive the retiree's initial evidence supporting the retiree's ability to return to work, in this instance,  Delphi had Dr. Jackson, the *Divisional* Medical Director, receive this evidence.  This fails to constitute evidence that Delphi can deviate from the CBA because the UAW rejected Delphi's initial determination and ultimately demanded a decision by an impartial specialist.  Resort to an impartial specialist is the ultimate remedy provided by the CBA for any dissatisfaction the UAW or the retiree has with the earlier stages in the T&PD review process.  (Delphi-UAW CBA, Gilliam Decl., ex 1 at 94-96.) Delphi complied with the UAW's demand and ultimately complied with Dr.

---

[15]*Allied Chemical & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 185-186 (1971) (applying § 8(d) to all mandatory subjects of bargaining).

Lemmen's conclusion.  Thus, the evidence uniformly supports the conclusion that the law requires: Delphi was bound by the CBA.

Motley's second argument is that the T&PD review process is not "neutral" because it fails to comply with the ADA.  Motley bases this argument on the Eleventh Circuit's requirement in *Lowe v. Alabama Power* that companies cannot rely on work restrictions imposed by doctors unless those restriction are based upon "particularized facts using the best available objective evidence as required by the regulations."  *Id.* at 1309.  In *Lowe*, the employer denied an employee a position based upon work restrictions imposed by a physician two years earlier.  Here, by contrast, the T&PD impartial expert, Dr. Lemmen, examined Motley on March 22, 2002, and he issued his conclusions six days later on March 28, 2002.  Dr. Lemmen's determination constituted Delphi's final decision on Motley's request for reinstatement.  Thus, Delphi's decision was based upon an examination of Motley made with six days of the employer's decision, as opposed to the two-year interval that the Eleventh Circuit repudiated as inadequate in *Lowe*.  Because Dr. Lemmen's decision was based upon a contemporaneous examination of Motley, in addition to a thorough review of her medical history, the defect identified by the Eleventh Circuit in *Lowe* simply is not present here.

Delphi has presented evidence that its decision not to reinstate Motley was

made for legitimate and non-discriminatory reasons, and Motley has failed to present any evidence the Delphi's proffered reason is pretextual.  Accordingly, Delphi is entitled to summary judgment on Motley's ADA claim on this ground.[16]

### CONCLUSION

Delphi is entitled to summary judgment on the ADA claims against it contained in Count I of the Second Amended Complaint.  A separate order will be entered.

**DONE** and **ORDERED** this 27th day of July, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[16]Because the court has determined to grant summary judgment to Delphi on the grounds already discussed, the court does not need to determine whether Delphi has established as a matter of law that Motley posed a direct threat to the health or safety of other individuals in the work place under § 103(b) of the ADA.  *See* 42 U.S.C.A. § 12113(b).

30